HUFSCHMIDT (ZINKEISEN v.). See Case No. 18,214.

HUGER (BROWN v.). See Case No. 2,013.

HUGER (UNITED STATES v.). See Case No. 15,415.

---

## Case No. 6,838.

HUGG et al. v. AUGUSTA INSURANCE & BANKING CO.

[Taney, 159.] [1]

Circuit Court, D. Maryland. April Term, 1851.

MARINE INSURANCE — TOTAL LOSS — DUTY TO REPAIR VESSEL—CONTRACT OF INSURANCE —AGENTS—INTEREST.

1. In an action on a policy of insurance, to recover, as for a total loss, the amount insured upon the freight on jerked beef, where it appeared that the vessel in which it was shipped was obliged to put into a port of distress, with the loss of a large portion of the beef, and that the balance was sold there, by an order of court, at a loss, in order to avoid further loss, and in consequence of the supposed inability of the vessel to proceed on her voyage: *held,* that there was not a total loss, when the beef was unladen at the port of distress, because a part of it still remained in specie, and had not been totally destroyed by the disaster.

2. There could be no recovery for a total loss, if the vessel could have been repaired within a reasonable time, and at a reasonable expense; and there was reasonable ground for believing that a portion of the beef might, by that means, be transported to the port of destination, although it might arrive there in a damaged condition, but yet retaining the character of jerked beef.

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

3. If the vessel could not have been repaired in a reasonable time, and at a reasonable expense, at the port of distress, yet if another vessel or vessels could have been procured upon reasonable terms, which could have carried the beef to the port of destination, there could be no such recovery for a total loss.

4. A sale made under such circumstances, by order of court, upon the application of the master, will not entitle the plaintiffs to recover for a total loss, unless the loss was at that time total, independently of such sale.

5. But the loss was total, if the repairs would have produced such a delay as would, in all probability, have occasioned a destruction of the remaining portion of the cargo, before it could arrive at its port of destination, or that it would have become so damaged, as to endanger the health of the crew on the voyage, from the noxious effluvia arising from it.

6. It is also total, if the expense of making the repairs, at the port of distress, so as to fit the vessel for carrying cargo, would have exceeded the amount of freight which would have been earned, by completing the voyage, and delivering at the port of destination, the remainder of the cargo; provided another vessel could not have been procured, upon terms that would have enabled the master to save same portion of the freight, for the benefit of the underwriters.

7. But the plaintiff must show the existence of these obstacles, in order to enable him to recover for a total loss.

8. The agent of the insurance company having made a change in the printed policy, by the following memorandum at the foot—"All losses under this policy to be settled agreeably to the terms of the Baltimore Insurance Company, the above notwithstanding:" *held*, that if this memorandum was made by the agent, acting within the scope of his authority, and before the policy was delivered to the assured and accepted by them, then the loss must be settled according to the terms of the Baltimore Insurance Company.

9. But if the agent was not acting within the scope of his authority, yet the plaintiff would be entitled to recover, if the jury find that the jerked beef was not a perishable article, in the mercantile sense of that term, as used in policies of insurance. And in determining this question, they must not look merely at the preparation and quality of this particular cargo, but must inquire and determine whether jerked beef, as an article of commerce, is a perishable one, in the sense in which the other articles enumerated in the policy are regarded as perishable.

10. As to the allowance of interest, in cases of this sort, in Maryland, the weight of authority seems to be in favor of leaving the question to the jury, where the sum due has never been liquidated, and is in dispute between the parties.

This was an action [by Jacob Hugg and John M. Bandel] upon a policy of insurance on the freight of the bark Margaret Hugg, at and from Baltimore to Rio Janeiro, and back to Havana or Matanzas, or a port in the United States, &c., to the amount of $5000, upon all kinds of lawful goods, &c.; beginning the adventure upon the said freight, from and immediately following the lading thereof aforesaid, at Baltimore, and continuing the same until the said goods, wares and merchandise shall be safely landed at the port aforesaid. The policy, which was executed at Augusta, Georgia, on the 16th April, 1841, had the following memorandum at the foot: "All losses under this policy to be settled agreeably to the terms of the Baltimore Insurance Company, the above notwithstanding. Geo. C. Morton, Agent. Baltimore, Dec. 9th 1841."

The terms of the Baltimore Insurance Company, in regard to payment of losses, were as follows: "And in case of loss, the same will be paid in ninety days after proof and adjustment thereof, deducting the amount of the premium, if then unpaid, and all sums due to the company from the insured, when such loss becomes due, provided such loss shall amount to five per cent. on the whole sum hereby insured, under which, no payment shall be made, except for general average." The printed terms of the policy sued on were as follows: "And the said the Augusta Insurance and Banking Company of the City of Augusta, do hereby undertake and agree to make good and satisfy unto the said assured, all such loss or damage on the said goods, wares, and merchandise, so laden as aforesaid, not exceeding in amount the sum insured thereon, as shall happen or arise from any (of the aforesaid) causes and casualties, excepting as before excepted, the said loss or damage to be estimated according to the true and actual value of the said property hereby insured, at the time the same shall happen; and to be paid within ninety days after notice and proof thereof, made by the insured: provided always, that the said company shall not be liable to make good any partial loss, or particular average, unless the same shall amount to five per cent. upon the value of the property hereby insured." The policy contained the usual memorandum enumerating the articles warranted free from average, and all others that were perishable in their own nature.

About four hundred tons of jerked beef were shipped on board the vessel, at Montevideo, which were to be delivered, in good order, at the port of Matanzas or Havana, to the consignees, they paying freight. The bill of lading was signed the 25th of April 1842. The vessel sailed from Montevideo the 29th of April, and after being out some forty-seven days, encountered a storm, and was driven on Gingerbread Ground, where she received considerable damage. The rudder was broken and unshipped, and as the extent of the damage could not be ascertained, it was deemed prudent, on consultation with the captain of a wrecking vessel and Bahama pilot, to go into Nassau, for the purpose of a survey and repairs; the wind was fair for that port, but ahead in the direction of Matanzas. The vessel was taken in charge by one of the wreckers; arrived at Nassau on the second day, about the 20th June; and grounded on the bar, while entering the harbor, under the charge of the king's pilot, by which she sustained a good deal of additional damage. A part of the beef had been thrown overboard, to lighten

the vessel, while on the Gingerbread Ground, and a much larger quantity while on the bar at Nassau. She had leaked, while on the ground at the former place, so that it was necessary to work the pumps every half hour; and at the latter place, there was seven or eight feet of water in the hold, with some fourteen men at the pumps. The beef was so much damaged by the sea-water, that the board of health, at Nassau, refused to allow more than 150 tons to be landed. The rest was ordered to be carried outside the bar and thrown into the sea, for fear of disease; it was wet and very much heated, and not in a fit condition to be shipped; and the board of health recommended to the authorities that it should be removed as soon as conveniently could be. The vessel was surveyed after the cargo was discharged, and it was found that the rudder was entirely broken off; the forefoot gone, and the keel greatly shattered and damaged; and it appears to have been conceded that she could not have been repaired at that port, so as to have carried on the cargo, and that if she could, it would have cost more than half her value. She was repaired so as to bring her home in ballast. It also appeared, that there was no vessel in port that could be procured to forward on the remaining cargo, even if it had been in a condition to be shipped.

The salvors libelled the vessel and cargo for salvage services, in the vice-admiralty court of the Bahamas, on the 30th June 1842, to which the master put in an answer, on the 7th of July, insisting that the libellants were entitled to compensation for pilotage only; and not for salvage. The court, on the 18th July, decreed $2100 salvage to the libellants, for services rendered to the vessel and cargo. Appraisers of the vessel, and cargo taken on shore, had been previously appointed; and on an examination of the cargo, it was found to be so much damaged, and in such a condition, that they advised an immediate sale, as it was deteriorating in value daily. The master assented to a sale, accordingly, which was ordered by the court, on his application, on the first of July. The net proceeds amounted to $2664 92. The time occupied in an ordinary voyage from Nassau to Matanzas is three days, and to Baltimore, ten. It was proved by several masters of vessels, that the navigation, at the place where the Margaret Hugg first grounded, and was visited by the pilots, was very hazardous, and that under similar circumstances, they would have considered it their duty to have carried the vessel into the harbor at Nassau. The regular premium for insurance of freight of the cargo covered by the policy for the outward voyage, was about one and one-eighth per cent.

At the first trial of this cause, the court was divided in opinion upon the questions of law presented to them, and the cause was taken to the supreme court upon a certificate of division. That court, at January term, 1849 (see 7 How. [48 U. S.] 595), gave as its opinion, upon the questions submitted to it:

1. That if the jury found that the jerked beef was a perishable article, within the meaning of the policy, the defendant is not liable, as for a total loss of the freight, unless it appears that there was a destruction, in specie, of the entire cargo, so that it had lost its original character at Nassau, the port of distress; or that a total destruction would have been inevitable from the damage received, if it had been re-shipped, before it could have arrived at Matanzas, the port of destination.

2. If the jury find that from the condition of that portion of the cargo sold at Nassau, it was for the interest of the insured and insurers of the cargo, that it should have been so sold, and not transported to Matanzas, still that the plaintiff is not entitled to recover, as for a total loss of freight, provided his own vessel could have been repaired, in a reasonable time and at a reasonable expense, so as to perform the voyage, or could he have procured another at Nassau, the port of distress, and have transshipped the portion sold, in specie, to the port of destination.

3. That, assuming the plaintiff is entitled to recover, the defendants are not entitled to deduct from the (amount) insured, the freight earned on the voyage from Baltimore to Rio, upon the outward cargo, as the policy is not for one entire voyage round from Baltimore, out and home.

At the second trial in this court, the parties offered the following prayers:

1. The plaintiffs pray the court to instruct the jury, that if they shall find that the policy declared on, and offered in evidence, was made by the defendants, and through George C. Morton, the agent of the defendants, delivered, with the memorandum thereon, signed by him, to the plaintiffs, and countersigned by him, as by its terms required; and that at the time of effecting the said insurance, the plaintiffs were owners of the vessel insured, and so continued to be; and that said vessel sailed on the voyage described on the policy, and in the course thereof, met with the disaster and encountered the perils stated in the testimony, and that thereby it became necessary, with a view to the interest of all concerned, that the vessel should proceed to Nassau; and that she went thither, and going into that port, met with the disaster mentioned in the testimony, and that by all those disasters, she suffered the damage set forth in the testimony, and that repairs became necessary to render her seaworthy; that a portion of her cargo of jerked beef was thrown overboard for the safety of the vessel in the perils aforesaid; and another part of it, because it had become spoiled by wet from sea-water, during the disasters aforesaid, and had become offensive and injuri-

ous to health, and in consequence of that, and of the orders of the local authorities of Nassau, was thrown overboard, and that the residue was landed and was sold under an order of the vice-admiralty court at Nassau, in manner as set forth in the proceedings in that court, given in testimony; and if the jury shall find that one-third of the quantity of the said cargo of jerked beef belonged to the owners, and two-thirds of said quantity to others, who were to pay freight for it, and that the freight aforesaid was of the amount of $5000, the sum insured, and that said cargo was laden and carried, in the course of the voyage described in the insurance; then the plaintiffs are entitled to recover for a total loss of the freight insured, and to the full amount, with interest from the time it became payable under the terms of the policy of said insurance.

2. If the jury find the facts stated in the aforegoing prayer, and shall further find that, from the condition of the landed beef, when landed, it was uncertain whether the same was sound and merchantable, or whether the same would continue to be so until the Margaret Hugg could be repaired, so as to carry the property, or a vessel or vessels could be found for shipping the same to its destination on the said voyage, and until when so shipped it should reach that destination, then the plaintiffs are entitled to recover for a total loss, the full amount and interest insured.

3. That if the jury find the facts set forth in the first of the above prayers, and shall also find that the Margaret Hugg could not be repaired, in a reasonable time, and be put in a condition for carrying on the cargo that was landed, nor another vessel or vessels be procured, within a reasonable time, and at a reasonable expense, for carrying it on to its destination, then the plaintiffs are, as aforesaid, entitled to recover as for a total loss.

4. That the plaintiffs are entitled to recover for a total loss, as aforesaid, if the jury shall find the facts of the said first prayer, and that it was for the interest of the insured and insurers that the landed cargo aforesaid, looking to its condition, and the uncertainty of the period of removing it, should be sold at Nassau, and not be transported to Matanzas; unless it shall appear to the jury, that the Margaret Hugg could have been repaired in a reasonable time, and at a reasonable expense, so as, with the cargo, to perform the voyage; or another vessel or vessels have been procured in a reasonable time, and at a reasonable expense, to transport it to its destination.

5. That the plaintiffs are entitled to recover, if the jury find the facts of the first prayer, for a partial loss of freight, for the portion of the cargo of jerked beef thrown overboard, notwithstanding it may appear to the jury that the vessel might have been repaired in a reasonable time, so as to carry on the part of the cargo landed at Nassau, or that another vessel or vessels might there have been procured, at a reasonable expense, to carry it on.

Defendants' prayers:

1. The defendants pray the court to instruct the jury, that if they find that the jerked beef was a perishable article, within the meaning of the policy sued on, then the defendants are not liable, as for a total loss of the freight, unless they, the jury, are also satisfied, from the evidence, that there was, by the perils insured against, a total destruction in specie of the entire cargo of beef, so that thereby it had lost its original character of beef, at Nassau, the port of distress; or that the jury shall be satisfied from the evidence, that if it had been there re-shipped for Matanzas, the port of destination, such a total destruction of the entire cargo, annihilating its original character of beef, in consequence of the damage it had then received, would have been inevitable, before it could have arrived at Matanzas.

2. That although the jury may be satisfied from the evidence, that the condition of that portion of the beef sold at Nassau, was then such, that it was for the interest of the insured and insurers of the cargo, that it should have been so sold, and not transported to Matanzas, still that the plaintiffs are not entitled to recover, provided that their own vessel could have been repaired within a reasonable time and at a reasonable expense, so as to perform the voyage, or they could have procured another vessel at Nassau, and have trans-shipped, in specie, the portion of the cargo sold to Matanzas.

3. That if the jury find that the beef was a perishable article, within the meaning of the policy, then the burden of proving the other facts hypothetically stated in the defendants' first prayer, is upon the plaintiffs; that is to say, it is for the plaintiffs to satisfy the jury that such facts existed.

4. That under the defendants' second prayer, the burden of proof is upon the plaintiffs to show, that their own vessel could not have been repaired within a reasonable time, and at a reasonable expense, so as to perform the voyage to Matanzas; or that they could not have procured another vessel at Nassau, and have trans-shipped for Matanzas, in specie, the portion of the cargo sold at Nassau; that is to say, it is for the plaintiffs to satisfy the jury that said facts existed.

5. That the plaintiffs are not entitled to recover, except under the terms of the policy, as it issued from the defendants' office, and not under any supposed change of such terms, to be found in the written memorandum now appearing at the foot of the policy, dated the 9th December 1841, and signed George C. Morton, agent, because there is no evidence of his having had any authority from the defendants to make such

memorandum, and the defendants, therefore, object to any such memorandum being given in evidence to the jury.

6. To entitle the plaintiffs to recover, they must show a loss within the meaning of the defendants' policy, irrespective of the said written memorandum mentioned in the next preceding prayer, because the only effect of that memorandum is, that when a loss occurs, within the meaning of the defendants' policy, it is to be adjusted within the terms of the policy used by the Baltimore Insurance Company, and not to bind the defendants for losses covered by the policies of that company, but not covered by the terms of defendants' own policy.

C. F. Mayle, for plaintiffs.
D. Stewart, for defendants.

The court declined giving to the jury the instructions asked by either party, and instructed the jury as follows:

TANEY, Circuit Justice. The first question to be decided is, whether the plaintiffs are entitled to recover for a total loss of freight. In deciding this question, it is not material to inquire whether the loss is to be adjusted by the terms of the Baltimore Insurance Company, or by those of the Augusta Insurance Company, without regard to the memorandum of George C. Morton, at the foot of that policy.

1. There was not a total loss, when the cargo of the Margaret Hugg was unladen at Nassau, because a part of the jerked beef still remained in specie, and had not been totally destroyed by the disasters. And the plaintiffs are not entitled for a total loss, if the Margaret Hugg could have been repaired within a reasonable time, and at a reasonable expense, and there was reasonable ground for believing that a portion of this beef might, by that means, be transported to Matanzas, although it might arrive there in a damaged condition, but yet retaining the character of jerked beef.

2. If this vessel could not have been repaired in a reasonable time, and at a reasonable expense, at Nassau, yet if another vessel or vessels could have been procured upon reasonable terms, which could have carried it to the port of destination, the plaintiffs are not entitled to recover.

3. The sale made by order of the court, having been made upon the application of the master, will not entitle the plaintiffs to recover for a total loss, unless the loss was at that time total, independently of such sale.

4. The loss was total, if the repairs would have produced such a delay, as would, in all probability, have occasioned a destruction of the remaining portion of the cargo before it could arrive at its port of destination; or that it would have become so damaged, as to endanger the health of the crew, on the voyage, from the noxious effluvia arising from it. It is also total, if the expense of making the repairs at Nassau, so as to fit the vessel for carrying cargo, would have exceeded the amount of freight which would have been earned by completing the voyage, and the delivery at Matanzas of the remaining portion of the cargo; provided another vessel or vessels could not have been procured at Nassau, upon terms that would have enabled the master to save some portion of the freight, for the benefit of the underwriters. But in order to justify the sale, and entitle the plaintiffs to recover for a total loss, it is incumbent upon them to show that these obstacles existed, and prevented him from completing the voyage.

If, under these instructions, the jury find that the plaintiffs are not entitled to recover for a total loss, the next question is, whether they are entitled to recover for a partial loss.

5. Upon that question, the court instruct the jury, that if the written memorandum at the foot of the policy, was made by George C. Morton, the agent of the company, acting within the scope of the authority conferred on him by the company, and was made before the policy was delivered to the plaintiffs and accepted by them, then the loss mentioned in the testimony must be settled according to the terms of the policy, at that time adopted and used by the Baltimore Insurance Company. And according to that policy, the plaintiffs are entitled to recover whatever loss of freight they may have actually sustained by the disasters mentioned in the testimony, provided such loss exceeds five per cent., and was occasioned by one of the perils enumerated and insured against in the Augusta policy.

6. If the jury find that the said George C. Morton was not acting within the scope of his authority, in making and signing the memorandum before mentioned, yet the plaintiffs are entitled to recover the amount of loss of freight actually sustained by them, if the jury find that jerked beef is not a perishable article, in the mercantile sense of the term, as used in policies of insurance; but in determining this question, they are not to look merely at the preparation and quality of this particular cargo, but must inquire and determine whether jerked beef, as an article of commerce, is a perishable one, in the sense in which the other articles enumerated in the policy of the Augusta Company, are regarded as perishable.

As to interest, in case the verdict was for the plaintiffs, the court were of opinion that, although in some of the states, and in the English courts, interest would be allowed as a matter of course, in a case of this kind, yet, in Maryland, the weight of authority appeared to be in favor of leaving the question to the jury, where the sum due had never been liquidated, and was in dispute between the parties. The jury were, there-

fore, instructed, if they found for the plaintiffs, to allow interest or not, as in their judgment they might deem just, upon the evidence before them.    Verdict and judgment for the plaintiffs.